916 F.2d 508
 59 USLW 2237
 GUARANTY NATIONAL INSURANCE COMPANY; Nationwide Mutual
Insurance Company; Farmers Insurance Exchange; Allstate
Insurance Company; United Services Automobile Association;
Safeco Insurance Company; Northland Insurance Company;
State Farm Mutual Automobile Insurance Company, Plaintiffs-Appellants,
v.
David A. GATES, Defendant-Appellee.
 No. 89-16288.
 United States Court of Appeals,
Ninth Circuit.
 Argued Jan. 9, 1990.
Submitted Jan. 16, 1990.
Decided Sept. 27, 1990.
As Amended Nov. 8, 1990.
 
 Frank Rothman, Darrel J. Hieber, Gary S. Glickman, Stephen J. McConnell, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., Robert R. Barengo, Reno, Nev., for plaintiffs-appellants Guar. Nat. Ins. Co., Nationwide Mut. Ins. Co., Allstate Ins. Co., United Services Auto. Ass'n, Safeco Ins. Co., Northland Ins. Co., and State Farm Mut. Auto. Ins. Co.
 Casey W. Vlautin, Woodburn, Wedge & Jeppson, Reno, Nev., for plaintiff-appellant Farmers Ins. Exchange.
 Brian McKay, Atty. Gen., Carson City, Nev., for defendant-appellee.
 Appeal from the United States District Court for the District of Nevada.
 Before WALLACE, ALARCON and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 OVERVIEW
 
 1
 Eight insurance companies brought this action for injunctive and declaratory relief against the Insurance Commissioner of the State of Nevada. The insurers challenged the constitutionality of Chapter 784, 1989 Statutes of Nevada, enacted by the Nevada legislature in June of 1989.
 
 
 2
 Chapter 784 mandates a rollback of rates for motor vehicle liability insurance to the levels that were in effect on July 1, 1988. Additionally, it requires a minimum rate reduction of fifteen percent below those July 1, 1988 rates. The reduced rates are to remain frozen for one year from October 1, 1989 until October 1, 1990. The effective date of Chapter 784 is October 1, 1989.
 
 
 3
 The insurers claim the requirements of Chapter 784 violate their constitutional right to due process because no relief is available from the imposed rates unless the Insurance Commissioner finds that an insurer is substantially threatened with insolvency. The insurers claim the mandated rates violate the Constitution because they permit confiscatory rates and do not provide for a fair rate of return.
 
 
 4
 Both parties moved for summary judgment. The district court granted summary judgment in favor of the Insurance Commissioner. We reverse.
 
 FACTS
 
 5
 Chapter 784 reads as follows:Section 1. 1. For any coverage for a policy of motor vehicle liability insurance issued or renewed on or after October 1, 1989, every insurer shall reduce its charges for motor vehicle liability insurance to levels which are at least 15 percent less than the charges for the same coverage which were in effect on July 1, 1988. For those persons who apply for a policy of motor vehicle liability insurance for the first time on or after October 1, 1989, the rate must be 15 percent less than the rate which was in effect on July 1, 1988, for similarly situated risks.
 
 
 6
 2. Between October 1, 1989, and October 1, 1990, rates and premiums reduced pursuant to this subsection may only be increased if the commissioner of insurance finds, after a hearing, that an insurer is substantially threatened with insolvency. The commissioner of insurance shall consider the profitability of all lines of insurance transacted by an insurer licensed to do business in this state in determining whether the insurer is substantially threatened with insolvency. For the purposes of this subsection, "insolvency" means the financial condition wherein the sum of the insurer's debts is greater than all of the insurer's property, at fair valuation.
 
 
 7
 3. Any separate affiliate of an insurer, established on or after October 1, 1989, is subject to the provisions of this section and shall reduce its charges to levels which are at least 15 percent less than the insurer's charges in effect on July 1, 1988.
 
 
 8
 4. Notwithstanding any previous notice of cancellation or renewal, any insurer that has issued a policy of motor vehicle liability insurance in this state that is in effect on October 1, 1989, and has a scheduled date for termination before October 1, 1990, shall not cancel that policy before October 1, 1990, or refuse to renew or extend that policy through September 30, 1990, for the purpose of avoiding the limit on rates required by this section.
 
 
 9
 5. Any insurer who cancels or fails to renew policies of motor vehicle liability insurance at a rate that exceeds his average monthly rate of cancellation or failure to renew, respectively, for the preceding 24 months by more than 10 percent during any 30-day period between October 1, 1989, and October 1, 1990, is required to show cause immediately to the commissioner why he is not in violation of this section. Any violation of this section is a violation of the Nevada Insurance Code. If the commissioner determines that the reason for the increase in the rate of cancellation of or failure to renew policies is an attempt to circumvent the reductions in rates, he may take appropriate disciplinary action.
 
 
 10
 6. For purposes of this section, "insurer" has the meaning ascribed to it in NRS 679A.100.
 
 
 11
 Sec. 2. This act becomes effective on October 1, 1989.
 
 
 12
 1989 Nev.Stat. 784, reprinted in Advance Sheets, Nev.Leg. 65th Sess., Vol. III at 1862-63.
 
 
 13
 The insurance companies allege in their complaint that on its face, Chapter 784 violates due process requirements because it prohibits rate relief to avoid confiscatory results. The complaint also alleges that, in addition to its facial invalidity, the application of Chapter 784 "would deprive each of the plaintiffs of property and other rights in violation of the due process and taking clauses of the ... United States Constitution. U.S. Const. amend. V & XIV."
 
 
 14
 In July of 1989, the insurance companies moved for summary judgment on their facial challenge to Chapter 784. On August 11, 1989, the district court granted a preliminary injunction to stay the operation of Chapter 784. The Insurance Commissioner filed a cross-motion for summary judgment, claiming that Chapter 784 is facially constitutional. In their motions for summary judgment, neither party challenged Chapter 784 as it applies individually to the insurance companies. Accordingly, the district court's opinion discusses only the facial challenge to the constitutionality of the Chapter.
 
 
 15
 After a hearing, the district court granted the Commissioner's cross-motion for summary judgment. The district court found the provisions of Chapter 784 to be within the police power of the State of Nevada and found the reduction and freeze of insurance rates reasonable as a temporary moratorium.
 
 
 16
 The insurers appealed. On October 16, 1989, this court stayed the application of Chapter 784 pending a decision on appeal.
 
 STANDARD OF REVIEW
 
 17
 A grant of summary judgment is reviewed de novo. Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986).
 
 
 18
 The appellants do not contend there are genuine issues of material fact. They argue that the district court did not correctly apply the relevant law to their facial challenge of Chapter 784.
 
 DISCUSSION
 Jurisdiction
 
 19
 The first issue is whether we have subject matter jurisdiction. The jurisdictional issue arises because the Declaratory Judgment Act, 28 U.S.C. Sec. 2201, is a procedural device only; it does not confer an independent basis of jurisdiction on the federal court. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950); see also Mobil Oil Corp. v. City of Long Beach, 772 F.2d 534, 539-40 (9th Cir.1985), limited on other grounds, Transamerica Occidental Life Ins. Co. v. DiGregorio, 811 F.2d 1249 (9th Cir.1987); Alton Box Bd. Co. v. Esprit de Corp., 682 F.2d 1267, 1273-74 (9th Cir.1982).[1] A declaratory judgment action may be entertained in federal court only if the coercive action that would have been necessary, absent the declaratory judgment procedure, could have been heard in a federal court. Id.
 
 
 20
 Here, it can be argued that the insurers' defense of due process would preclude the declaratory judgment defendant, the Insurance Commissioner of Nevada, from successfully litigating against the insurers an action to enforce Chapter 784 under state law. Under this analysis, the federal courts lack jurisdiction. However, there is a complicating factor.
 
 
 21
 The plaintiffs have asked for injunctive as well as declaratory relief. Therefore, this case is very similar to Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). There, the shareholders of nine railroads brought suit to enjoin the Attorney General of Minnesota from enforcing state rate regulations that allegedly violated the railroads' constitutional rights. The shareholders alleged that the rate regulations, which reduced the railroads' tariffs and charges, were unjust, unreasonable, and confiscatory and would, if enforced, deprive them of their property without due process of law. Young, 209 U.S. at 130, 28 S.Ct. at 444. The Supreme Court held that the railroads should not be forced to violate the statute and then assert their constitutional claims as a defense to the state enforcement action. Id. at 165, 28 S.Ct. at 456. The Court thought the railroads should not have to bear the risk of large losses by having to disobey the act and then proceed in state court. Id. The Court noted that the suit raised significant questions of federal law within the meaning of the jurisdictional statute. Id. at 161-62, 28 S.Ct. at 454-55.
 
 
 22
 Recently, the Supreme Court has reiterated its position: "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983) (citing Young, 209 U.S. at 160-62, 28 S.Ct. at 454-55.) Commentators observe: "[t]he best explanation of Ex parte Young and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws." 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure Sec. 3566, at 102 (1984). They also observe that Shaw "leaves open the possibility that federal jurisdiction exists if an injunctive relief is sought against state officials to restrain enforcement of a state statute, but that it would not exist if only a declaratory judgment were sought." Id. 463 U.S. at 103, 103 S.Ct. at 2903.
 
 
 23
 Like the shareholders in Young, the appellants here claim that the mandated rates in Chapter 784 violate the Constitution because they permit confiscatory rates and do not provide for a fair rate of return. They allege that in addition to its facial invalidity, the application of Chapter 784 would deprive each of them of property and other rights in violation of the due process clause of the U.S. Constitution. They allege that under the Constitution, "a rate-setting statute's standards and procedures must protect the interests of the regulated company, its owners, investors or members" and that "[l]egislation regulating rates is unconstitutional if it does not afford the regulated party the opportunity to earn, at a very minimum, a fair and reasonable rate of return. This constitutional standard applies to the regulation of insurance rates."
 
 
 24
 Thus, there is a federal right at stake, and enforcement of Chapter 784 would interfere with it. Consequently, there is federal court jurisdiction.
 
 Whether Chapter 784 Is Unconstitutional
 
 25
 The insurers contend the district court erred in granting summary judgment in favor of the Insurance Commissioner and in dismissing their complaint because: (1) the court did not correctly apply the relevant substantive law, in that Chapter 784 on its face violates constitutional due process requirements; (2) a statute setting rates is unconstitutional on its face if its terms do not permit those who administer it to avoid confiscatory rates; (3) Chapter 784 does not provide an adequate standard for rate relief in the face of a high risk of confiscatory rates; (4) precedent establishes that only a grave national emergency can justify a temporary deprivation of a fair and reasonable return; and (5) the district court should not have dismissed the entire complaint because the cross-motions for summary judgment did not deal with the "as-applied" claims of each insurer. Accordingly, the insurers argue they are entitled to demonstrate that Chapter 784 is confiscatory as applied to each of them if this court does not invalidate the chapter.
 
 
 26
 We agree that Chapter 784 is unconstitutional. Neither Chapter 784 nor the Nevada Insurance Code of which it is a part provides any mechanism to guarantee a constitutionally required fair and reasonable return. Our decision is best explained by comparing Chapter 784 with its California counterpart, Proposition 103, and by explaining the California Supreme Court's decision with respect to the constitutionality of that proposition.
 
 
 27
 Proposition 103 was enacted in California in November of 1988. It was an initiative measure that proposed fundamental changes in the regulation of automobile and other types of insurance. The proposition's stated purpose was to make insurance available to Californians by prohibiting insurance companies from charging "excessive, unjustified and arbitrary rates." Calfarm Ins. Co. v. Deukmejian, 48 Cal.3d 805, 813, 258 Cal.Rptr. 161, 164, 771 P.2d 1247, 1250 (1989). In a challenge to Proposition 103 from the insurance industries, the California Supreme Court in Calfarm severed an insolvency provision in Proposition 103 that was found unconstitutional, but upheld the remainder of the Proposition.[2]
 
 
 28
 Like Nevada's Chapter 784, Proposition 103 required a rollback, reduction, and freeze in rates for one year.[3] Cal.Ins.Code Sec. 1861.01 (West 1990). Rates could be increased only if the California Insurance Commissioner found "that an insurer is substantially threatened with insolvency." Cal.Ins.Code Sec. 1861.01(b). Insurers were prohibited from declining to renew a policy except where there was fraud, nonpayment of premium, or significant increase in the hazard insured against. Cal.Ins.Code Sec. 1861.03(c)(1).
 
 
 29
 Proposition 103 contained a severance provision so that if any portion were declared invalid, it "shall not affect other provisions or applications of the act which can be given effect without the invalid provision...." Cal.Ins.Code Sec. 1861.01, note (c).
 
 
 30
 Seven insurers and the Association of California Insurance Companies petitioned the California Supreme Court for a writ of mandate that Proposition 103 was unconstitutional on its face. They argued that the rollback and reduction of insurance rates were arbitrary, discriminatory, and confiscatory; that the rate adjustment mechanism did not permit relief from confiscatory rates; and that adequate procedures to ensure prompt rate relief were not provided. Calfarm, 48 Cal.3d at 814, 258 Cal.Rptr. at 164, 771 P.2d at 1250.
 
 
 31
 The California Supreme Court held the insolvency provision unconstitutional on its face but upheld the remainder of Proposition 103. The Court first recited the standard for determining if a state price-control regulation is unconstitutional under the due process clause: whether the regulation is " 'arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.' " Id. at 816, 258 Cal.Rptr. at 166, 771 P.2d at 1252 (quoting Nebbia v. New York, 291 U.S. 502, 539, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934)); see also Pennell v. City of San Jose, 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988) (reaffirming this test). Then, the Court decided that since the "face of a statute rarely reveals whether the rates it specifies are confiscatory or arbitrary," it would focus instead on the insurer's ability to obtain relief if the rate set by Proposition 103 proved to be confiscatory. Calfarm, 48 Cal.3d at 816-17, 258 Cal.Rptr. 166-67, 771 P.2d at 1252-53. Accordingly, the Court examined all the provisions in Proposition 103 to see if there were any that would permit relief from confiscatory rates. Id. at 817, 258 Cal.Rptr. at 167, 771 P.2d at 1253.
 
 
 32
 The Court found two provisions in Proposition 103 that would enable an insurer to seek relief. First, an insurer could file an application with the Insurance Commissioner if it desired to change any rate. Id. Second, the Commissioner could not approve any rate "which is excessive, inadequate, unfairly discriminatory or otherwise in violation of th[e] chapter." The Court found this language provided relief from confiscatory rates. Id.
 
 
 33
 However, the Court found that the insolvency provision limited this relief. Id. It found that no definition of "insolvency" could conform to the constitutional standard of a fair and reasonable return.[4] Id. at 818-19, 258 Cal.Rptr. at 167-68, 771 P.2d at 1253-54. The Court also found that the insolvency standard referred to the insurance company as a whole, not just to regulate lines of insurance. Therefore, the insurer might well be solvent in states other than California, or solvent in lines of insurance in California unregulated by Proposition 103, thus precluding rate relief in California in the lines regulated by Proposition 103. The California Supreme Court reasoned that the "insolvency" provision prevented solvent insurers from obtaining relief from "inadequate" rates in California until November 1989. Id. at 819, 258 Cal.Rptr. at 168, 771 P.2d at 1254.
 
 
 34
 The Court also refused to sustain Proposition 103 with its insolvency provision as a temporary or emergency measure. First, it distinguished cases sustaining freezes temporarily, finding that the prices frozen in those cases were set by sellers in a competitive market, so that the only concern was increased costs during the pendency of the freeze. Id. at 819-20, 258 Cal.Rptr. at 168-69, 771 P.2d at 1254-55. Proposition 103, on the other hand, did not mandate freezing a price originally set by a seller, but instead required a reduction to at least twenty percent less than rates formerly in effect. Under these circumstances, the Court found "[t]he risk that the rate set by the statute is confiscatory as to some insurers from its inception is high enough to require an adequate method for obtaining individualized relief." Id. at 820, 258 Cal.Rptr. at 169, 771 P.2d at 1255.
 
 
 35
 Second, the Court did not find an emergency situation existed to justify a temporary freeze on automobile liability insurance rates after a rollback and reduction. The Court stated:
 
 
 36
 To justify a measure which deprives persons of a fair return, however, "an emergency would have to be a temporary situation of such enormity that all individuals might reasonably be required to make sacrifices for the common weal." We do not believe that the circumstances which inspired Proposition 103 meet this requirement. Our concern is not with the magnitude of the problem, but with its character. The asserted rise in insurance rates, rendering insurance unavailable or unaffordable to many, is not a temporary problem; it is a long term, chronic situation which will not be solved by compelling insurers to sell at less than a fair return for a year. Over the long term the state must permit insurers a fair return; we do not perceive any short term conditions that would require depriving them of a fair return. We therefore conclude that [Proposition 103] cannot be sustained as an emergency measure fashioned to meet a temporary exigency.
 
 
 37
 Id. at 820-21, 258 Cal.Rptr. at 169-70, 771 P.2d at 1255 (citation and footnote omitted).
 
 
 38
 Accordingly, the Court held the insolvency provision invalid under the due process clause of the California and United States Constitutions. Id. at 821, 258 Cal.Rptr. at 170, 771 P.2d at 1255-56. However, the Court found the insolvency provision to be severable from the remainder of Proposition 103 under California case law. It found that severability did not effect the general standard for rate adjustment; that is,
 
 
 39
 "[n]o rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive, inadequate or unfairly discriminatory no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income."
 
 
 40
 Id. at 822, 258 Cal.Rptr. at 170, 771 P.2d at 1256 (quoting Cal.Ins.Code Sec. 1861.05(a)). In view of this safeguard, efficient administrative procedures, and the broad discretion of the Insurance Commissioner to grant relief, the Court refused to find the provision for a rollback and reduction of at least twenty percent below the 1987 insurance rate levels violative of the due process rights of insurers. Id. at 823-25, 258 Cal.Rptr. at 171-73, 771 P.2d at 1257-59.
 
 Chapter 784
 
 41
 The insurers argue that, unlike the solution reached in California, the insolvency provision cannot be severed because there is no constitutionally permissible standard to take its place. Unlike the much longer Proposition 103, Chapter 784 itself does not contain any provisions for relief from potentially confiscatory rates. However, we find, as the district court did, that the provisions of Chapter 784 are part of the statutory structure of Nevada law that provides for the regulation of insurance rates,[5] because no language in Chapter 784 states that it nullifies or replaces any other statutory insurance provisions.
 
 
 42
 Exactly like Proposition 103, the Nevada insurance statutes provide that "[r]ates must not be excessive, inadequate or unfairly discriminatory...." Nev.Rev.Stat. Sec. 686B.050(1) (1987); cf. Cal.Ins.Code Sec. 1861.05(a). At this point, however, there is a critical divergence between the Nevada and California legislation. Proposition 103 nowhere defines the term "inadequate," whereas the Nevada Insurance Code does. Section 686B.050(3) of the Nevada Revised Statutes states: "[r]ates are inadequate if they are clearly insufficient, together with the income from investments attributable to them, to sustain projected losses and expenses in the class of business of which they apply."
 
 
 43
 It follows from this definition that if projected losses and expenses are simply met, the rates are adequate. Thus, section 686B.050(3) guarantees only that an insurer will break even; it does not guarantee the constitutionally required "fair and reasonable return." See Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) ("[T]he fixing of 'just and reasonable' rates, involves a balancing of the investor and consumer interests.... [T]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include the service of the debt and dividends on the stock."). Because section 686B.050(3) specifically defines "inadequate" in a constitutionally unacceptable fashion, we may not simply sever the insolvency provision from Chapter 784 in the context of the Nevada Insurance Code and uphold the rest of this measure, as the California Supreme Court did in Calfarm.
 
 
 44
 There is a second argument why section 686B.050 of the Nevada Revised Statutes may not be used to save Chapter 784 if the insolvency provision were severed.[6] The insurers contend that because section 686B.050 "was written to empower the Insurance Commissioner to order an insurer voluntarily charging unreasonably low rates to increase those rates ... it is inappropriate as a standard for relief from rates set by statute." This argument finds some support in dicta in Calfarm. There, the court observed that because section 1852 of the California insurance code, which was superseded by Proposition 102's standard that "[r]ates must not be excessive, inadequate or unfairly discriminatory,"
 
 
 45
 was written for a system in which insurers set their own rates, and an unreasonably low rate suggested either mismanagement or predatory intent [,i]t is inappropriate for a system in which rates must be approved by the commissioner, and its repeal by Proposition 103 indicates that the drafters did not intend to confine "inadequacy" to cases of impending insolvency, monopoly, or destruction of competition.
 
 
 46
 Calfarm, 48 Cal.3d at 822 n. 15, 258 Cal.Rptr. at 171 n. 15, 771 P.2d at 1257 n. 15. Although section 686B.050(1) contains language like that of Proposition 103, the entire section 686B.050 contains language more akin overall to the language of section 1852 that the Calfarm court thought was unsatisfactory to provide relief from rates set by statute.
 
 
 47
 We find, therefore, that we cannot sever the insolvency provision from Chapter 784 and uphold the remainder, as the California Supreme Court did with Proposition 103. Section 686B.050 has other provisions, specifically section 686B.050(3), and a legislative context that serve as obstacles to any conclusion that Chapter 784 is constitutional if the insolvency provision is severed. Moreover, for the same reasons cited by the California Supreme Court in Calfarm, we cannot sustain Chapter 784 as a temporary emergency measure.
 
 
 48
 Because we invalidate Chapter 784 as unconstitutional, we need not reach the insurers' arguments regarding the dismissal of their "as-applied" claims.
 
 
 49
 REVERSED.
 
 
 
 [1]
 In each of these cases, declaratory relief was unavailable because the declaratory judgment complaints raised no federal question. Rather, the federal issues raised were defenses to claims that arose under state law. "A claim does not arise under federal law within the meaning of section 1331 where it relies on federal law only to establish an immunity or defense which would preclude the declaratory judgment defendant from successfully litigating against the declaratory judgment plaintiff a claim arising under state law." Esprit, 682 F.2d at 1274
 
 
 [2]
 Section 2 of Chapter 784 defines "insolvency" as "the financial condition wherein the sum of the insurer's debts is greater than all of the insurer's property." This definition is similar to the one the California Supreme Court found capable of producing confiscatory rates, even though the rates did not threaten the insurer's solvency. See Calfarm, 48 Cal.3d at 818-19, 258 Cal.Rptr. at 167-68, 771 P.2d at 1253-54
 
 
 [3]
 Proposition 103 reduced rates by a minimum of twenty percent less than the rate in effect in November 1987
 
 
 [4]
 The concept of a "fair and reasonable" return as a constitutional standard for regulated industries is derived from early Supreme Court cases discussing the Natural Gas Act of 1938, 15 U.S.C. Sec. 717. The Act allowed the Federal Power Commission to regulate the price of natural gas. Section 4(a) of that Act required that all rates and charges in connection with the transportation or sale of natural gas be "just and reasonable." Federal Power Comm'n v. Natural Gas Pipeline Co., 315 U.S. 575, 581-82, 62 S.Ct. 736, 740-41, 86 L.Ed. 1037 (1942). That requirement is still in effect. 15 U.S.C. Sec. 717c
 
 
 [5]
 Nevada's general insurance code, Nev.Rev.Stat. (NRS) Secs. 679A-693B (1987), is found in Volumes 38 and 39 of the Nevada Revised Statutes
 
 
 [6]
 The Nevada Revised Statutes contain a general severability provision. Nevada Revised Statute Sec. 0.020(1) states:
 If any provision of the Nevada Revised Statutes, or the application thereof to any person, thing or circumstance is held invalid, such invalidity shall not affect the provisions or application of NRS which can be given effect without the invalid provision or application, and to this end the provisions of NRS are declared to be severable.
 The standard in Nevada for severing unconstitutional provisions from unobjectionable ones is twofold: (1) whether, when standing alone, an unobjectionable provision can be given legal effect, and (2) whether the legislature intended the unobjectionable provision to stand alone in the event other provisions were declared invalid. County of Clark v. City of Las Vegas, 92 Nev. 323, 550 P.2d 779, 788 (1976) (citing Dorchy v. Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 324, 68 L.Ed. 686 (1924)).